**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| **DONNA HARRIS,** *as Co-Personal* **Representative** *of estate of* **William J. Harris, deceased,** *et al.*,      **Plaintiffs,**     v.     **LANDMARK RECOVERY OF CARMEL LLC,** *doing business as* **Praxis of South Bend by Landmark Recovery,** *et al.*,      **Defendants.** | **CAUSE NO. 3:23-cv-00862-CCB-ALT** |

### OPINION AND ORDER

Before the Court is a motion for sanctions and spoliation relief filed by Plaintiffs Donna Harris and Banza Townsend, as co-personal representatives of the estate of William Harris, deceased, on November 4, 2025, asking the Court to impose "the sanction of default and/or adverse inference and corresponding jury instructions in regards to the video surveillance footage, grievance forms, and Microsoft Teams/Sunwave EMR communications" against Defendants Landmark Recovery of Carmel LLC, Landmark Recovery of Louisville LLC, and Landmark Recovery Management Company LLC (together, "Landmark") (ECF 159).[1] Landmark filed a response in opposition on November 18, 2025, and Plaintiffs timely replied. (ECF 165, 166). On December 9, 2025, the Court heard oral argument on the motion, denied it as to the grievance forms, and took the remainder of the motion under advisement. (ECF 171).[2]

---

[1] EMR is an abbreviation for electronic medical record. (*See* ECF 187 at 24).

[2] The transcript of the December 9, 2025, hearing is located at ECF 189.

1

On March 12, 2026, the Court held an evidentiary hearing on the motion for sanctions as to the video surveillance and Teams/Sunwave EMR communications, after which the Court ordered post-hearing briefing. (ECF 184).[3] Plaintiffs filed their brief in support of the motion on April 1, 2026 (ECF 191), Landmark filed a response in opposition on May 1, 2026 (ECF 195), and Plaintiffs timely replied (ECF 196). Therefore, the motion for sanctions as to the video surveillance and Teams/Sunwave EMR communications is now ripe for ruling.

For the following reasons, Plaintiffs' motion for sanctions will be GRANTED to the extent described herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following is a summary of the facts of record relevant to the motion for sanctions:

### A. Events Near in Time to Harris's Death on July 9, 2023

From June 19 through early July 2023, William Harris was a resident at Defendants' Mishawaka substance abuse rehabilitation facility (the "facility"). (ECF 161-1 ¶ 8; ECF 192-3).[4] On July 3, 2023, a resident at the facility passed away. (ECF 192-4). The St. Joseph County Coroner (the "Coroner") was called, and video surveillance was requested. (*Id.*). The next day, July 4, 2023, another resident at the facility passed away. (*Id.*). Again, the Coroner was called, and video surveillance was requested. (*Id.*).

On July 9, 2023, Harris committed suicide by hanging himself at the facility. (ECF 192-2, 192-4). Landmark completed an internal Incident Report on July 11, 2023, identifying a "system breakdown" as contributing to Harris's death. (ECF 192-2). On or about July 11, 2023, the St.

---

[3] The transcript of the February 18, 2026, evidentiary hearing is located at ECF 187.

[4] Several months earlier, on March 13, 2023, the facility was placed on "conditional status" by the Indiana Family & Social Services Administration ("FSSA") due to noncompliance with various regulations. (ECF 161-13).

Joseph County Police Department (the "Police") requested the video surveillance for Harris. (ECF 192-4). On July 12, 2023, three days after Harris's death, Landmark's in-house legal counsel enacted a litigation hold for Harris. (ECF 187 at 186-87, 205, 211-212). That same day, FSSA issued the facility an amended conditional status based on three deaths that were not reported in accordance with applicable regulations. (ECF 161-13). On July 27, 2023, the Division of Mental Health and Addiction of FSSA revoked Landmark's certification due to several violations. (*Id.*).

On July 31, 2023, the Coroner filed suit against Landmark, seeking an order granting a request for production of documents from Landmark related to the death investigations at the facility. (*See* ECF 13 ¶ 3). On August 5, 2023, Plaintiffs sent Landmark a letter requesting that evidence be preserved relating to the prior year of the facility. (ECF 161-12). Landmark responded that Indiana law requires the preservation of all evidence, including emails, text messages, writings, notes, and any other form of paper or electronically stored information (ESI) that could be relevant to the dispute. (*Id.*). On August 30, 2023, the St. Joseph Circuit/Superior Court ordered Landmark to release withheld video surveillance requested by the Coroner's subpoenas. (ECF 13-1). On August 17, 2023, the facility was effectively shut down. (ECF 161-13).

### B. Plaintiffs Filed This Suit Against Landmark on August 18, 2023

The next day, August 18, 2023, Plaintiffs filed this suit against Landmark in St. Joseph County Superior Court. (ECF 5). On September 2, 2023, Landmark removed Plaintiffs' suit to this Court on the basis of diversity jurisdiction. (ECF 1). A preliminary pretrial conference was conducted on October 24, 2023. (ECF 14). On November 23, 2023, Plaintiffs served Landmark with discovery requests seeking video surveillance and Teams/Sunwave EMR communications.

3

(ECF 161-2). On February 19, 2024, Landmark objected to Plaintiffs' request, citing their privilege log which addressed "videos" and "records of patients" as privileged and confidential but was silent as to Teams communications. (ECF 161-3). In July and August 2024, Landmark disclosed Harris's substance use disorder records, but still no video surveillance or Teams communications. (ECF 192-1 at 4). On November 26, 2024, Plaintiffs sent Landmark their third request for production of documents, which Landmark responded to on June 6, 2025. (ECF 161-20).

On June 27, 2025, Plaintiffs disclosed the affidavit of Keva Swopes, a nurse practitioner employed by a health care staffing company and assigned to work via telehealth for the facility from May 2023 through July 9, 2023. (ECF 161-1). Swopes attested in the affidavit that: (1) she was given a computer by the facility to conduct her telehealth work; (2) she primarily used the chat or texting features of Microsoft Teams to communicate orders to on-site facility staff; (3) she assisted in Harris's care from approximately June 19, 2023, until July 9, 2023; (4) on July 7, 2023, she learned that Harris had verbalized suicidal ideation during a therapy session and "refused to contract for safety"; and (5) on July 7, 2023, she issued orders via Teams for on-site staff to check on Harris every thirty minutes, which she later changed to every fifteen minutes, and to transfer him to an outside facility for a higher level of care ("HLOC"). (ECF 148-1, 161-1; *see* ECF 187 at 182). On July 18, 2025, Landmark's counsel emailed Plaintiffs' counsel that Landmark had been "unable to find any of the alleged team communications referenced in the Swopes Affidavit" and would let Plaintiffs know if Landmark had any information to provide on the video surveillance issue. (ECF 161-10).

### C. Plaintiffs File the Motion for Sanctions

On November 4, 2025, Plaintiffs filed the instant motion for sanctions, together with a

supporting brief and exhibits. (ECF 159-162). In their response brief dated November 18, 2025, Landmark suggested there was a "technological retention problem" and the discovery issue was a "reflection of technological and institutional limitations rather than willful conduct." (ECF 165). In support, Landmark produced the affidavit of Veronika Carnogurska, Landmark's Director of Legal Operations, who attested that searches were conducted in response to Plaintiffs' discovery requests and all non-privileged responsive materials in Landmark's possession, custody, or control were produced. (ECF 165-1).

### D. The December 9, 2025, Hearing

On December 9, 2025, the Court held a hearing on the motion for sanctions at which oral argument was heard. (ECF 171; *see* ECF 189). At the hearing, Landmark's counsel conveyed Landmark's position as: (1) there were never any Teams communications as to Swopes, and (2) there was no video surveillance aside from July 3 to July 5, 2023, because the video surveillance was destroyed in the normal course of business based on a written or unwritten document retention policy. (ECF 167, 171; *see* ECF 189 at 38-39, 41, 58, 65-66).

### E. The February 18, 2026, Evidentiary Hearing

On February 18, 2026, the Court held an evidentiary hearing as to the video surveillance and the Teams/Sunwave EMR communications. (ECF 184; *see* ECF 187). Plaintiffs presented three witnesses: Cynthia Williams, a nurse practitioner for Landmark's corporate office;[5] Marcista Northern, an on-site patient navigator and case manager at the facility during the entirety of the period the facility was open; and Swopes, an off-site contract nurse practitioner

---

[5] At one point during her testimony, Williams refused to answer Landmark's counsel's question whether she was a client of Plaintiffs' counsel's law firm. (ECF 187 at 58-59). As a result, the Court "dr[e]w a negative inference from her failure to answer" and "assume[d] her answer to the question would otherwise impeach her credibility for each and every answer" she had given. (*Id*. at 59). The Court has not materially relied on Williams's testimony in reaching its decision on the motion for sanctions.

for the facility during the relevant period. *(Id.* at 5, 7, 77, 89, 123). Landmark produced just one witness: Andrew Smith, the Vice President of Telemedicine for Landmark during the relevant period and currently the Vice President of Development and sole staff member for Landmark Recovery Management Company. (*Id.* at 5, 185, 200, 206).

      1. <u>Teams/Sunwave EMR Communications</u>

         *a. Plaintiffs' Witnesses*

Williams, Northern, and Swopes all testified they communicated with on-site and off-site staff at the facility on a daily basis using Teams messaging. (*Id.* at 10, 79, 100, 113, 125, 127). Chats were not patient specific. (*Id.* at 128). Chats could be among all staff about facility happenings ("all Teams chat"), a small group of staff in a specific wing of the facility, or between two individuals such as a supervisor and employee. (*Id.* at 79-81, 111-12, 127). Swopes testified that Teams was the primary method for communicating with on-site staff because the telephone would always ring busy, and that Teams was the primary method for communicating "stat orders" to on-site staff. (*Id.* at 125-27, 141-42; *see also id.* at 111-12). Northern testified that she did see verbal orders conveyed through Teams if urgent, but that Sunwave EMR was the primary method of communication regarding patient needs in substance abuse recovery. (*Id.* at 110-11). Northern clarified, however, that documenting orders was "out of [her] scope of things." (*Id.* at 110-12).

Staff could find patient-specific notes by scrolling through the Teams messages, which were time-stamped. (*Id.* at 116-17, 128-29). When discussing specific patient orders in Teams messages, staff used the patient name (for example, William H.) and date of birth as identifiers. (*Id.* at 127). To catch up on days they were not working, staff would scroll through the chats for the wing a patient was assigned to. (*Id.* at 130-31). Teams messages were searchable, as Northern

testified she would type a name and "anything I ever wrote about a patient will come up." (*Id.* at 84). Swopes testified that she had access to all of the Teams messages from the date she started to the date she left. (*Id.* at 128-29).

Sunwave was a separate software program used to document the EMR. (*Id.* at 129, 187). Teams messages were not integrated with the Sunwave EMR and were not always reduced to writing in the Sunwave EMR. (*Id.* at 82, 117-18, 129, 137, 181-82). For example, because Northern was not a medical provider, she would "reach out directly to a nurse practitioner through Teams." (AR 83-84). Northern stated the only way to obtain a complete picture of a patient's treatment is to have both the Teams messages and the Sunwave EMR. (*Id.* at 83).

Northern and Swopes both used Teams to coordinate Harris's care. Northern testified that she saw a Teams chat during Harris's stay indicating he was having issues or was upset, so she arranged a nurse practitioner to consult through Teams. (*Id.* at 86-87, 93).[6]

Swopes's testimony is summarized as follows: She was contacted on July 7, 2023, by a counselor via Teams that Harris "had verbalized during their session that he would rather unalive himself than have to go to a shelter." (*Id.* at 133). When Harris refused to see a provider, Swopes communicated via Teams that it was "imperative that [Harris] is sent out HLOC" and that he "cannot stay at the building." (*Id.* at 133-34, 176). Swopes then issued a transfer order via Teams. (*Id.* at 142-43, 169).[7] After doing so, Swopes communicated with on-site providers via Teams to place Harris on suicide watch and detox to allow for one-to-one supervision. (*Id.* at 135-36; *see also id.* at 179 ("It was 30 minutes [checks] that advanced to 15 …. [T]hey said they couldn't

---

[6] Harris was assigned to another case manager, Lauren Whitaker, at the facility, but Northern was familiar with Harris because she would assist in Harris's care on weekends or when Whitaker was unavailable. (*Id.* at 89-94).

[7] Swopes stated that she did not know how to actually enter the HLOC order in Sunwave, so she reached out to another Landmark staff member via Teams, who placed the order for her. (*Id.* at 142-43, 171).

implement the 15-minute orders. I asked that he be sent to detox … for closer monitoring.")).

However, on-site staff responded in opposition to her orders via Teams, stating Harris was not

displaying any self-injurious behavior. (*Id.* at 135, 170). Swopes then engaged in a separate

individual Teams chat with a different nurse practitioner and another individual to express

concerns about the order for Harris. (*Id.* at 135). Swopes continued to check in on Harris via

Teams using patient identifiers. (*Id.* at 158-59).[8]

  *b. Smith*

  Smith's testimony is summarized as follows: When Landmark's legal department

foresees potential litigation, notification will be sent out to members within the company to

ensure that documents and records relevant to the litigation are retained. (*Id.* at 186). Landmark's

in-house counsel enacted a litigation hold for Harris on July 12, 2023—just three days after his

death. (*Id.* at 186-87, 205).

  The Sunwave EMR is automatically stored for seven years. (*Id.* at 186). Teams messages

could be handled by compliance or IT. (*Id.*). The collecting of patient records would include both

the Sunwave EMR and any Teams data regarding the patient. (*Id.* at 187). Procedurally, facility

departments would funnel this information into a "Sharepoint" file to ensure that documents are

retained. (*Id.*). As to Harris, Smith stated: "There is nothing available to us in that [Sharepoint]

legal file, and so I would assume that the procedure was followed and yielded no results." (*Id.* at

189).

---

[8] Landmark's Incident Report completed July 11, 2023, reflected that a "system breakdown" contributed to Harris's suicide. (ECF 192-2). In describing the breakdown, Landmark wrote that "[c]ommunications with the nurse practitioner suggested that [patient] be sent to HLOC for refusal to agree to safety plan and history of suicide attempts." (*Id.*). Harris's EMR reflects that "CD followed up via Teams with both NP's on call at 7:55p.m", and that "CD followed back up via Teams confirming that NP read collateral notes and that CD read/approved from assigned ITH to understand why CD and ITH was asking NP to send to HLOC." (*Id.* at 137-38; ECF 192-3). Swopes testified that those communications would be in Teams. (ECF 187 at 138).

Smith also testified that neither he nor Landmark have access to their "IT infrastructure" because some of Landmark's contracts had been taken over by Alsos Management ("Alsos") after Landmark lost the contracts to manage the facilities and the infrastructure. (*Id.* at 189, 193, 213).[9] This transfer to Alsos occurred in July 2025—two years after Harris's death. (*Id.* at 213-14). Smith did not know why Teams communications or video chats with patients would be outsourced to Alsos two years after a litigation hold was placed on those materials. (*Id.* at 216). Smith reached out to Rusk Haskett, the Alsos IT person, and asked that he search key terms in the IT infrastructure that Alsos took over from Landmark. (*Id.* at 193-94). Hasket responded to Smith "there was nothing that came back … to the requests that I had made with the person in question, Ms. Swopes, the time frame, and well as the key search terms …." (*Id.* at 195). Smith had no personal knowledge "of any Teams communication or if it was saved, and if it was, where the whereabouts would be." (*Id.* at 193). He did not "know whether or not [any Teams communications] exist, because there's no policy requiring them to exist[.]" (*Id.* at 194). That is, Landmark had no written policy addressing retention of Teams communications for the facility in June and July 2023. (*Id.* at 192).

2. <u>Video Surveillance</u>

a.  *Plaintiff's Witnesses*

Northern testified that there were cameras on-site in the facility for safety and surveillance. (*Id.* at 87). She explained that if a fight broke out, staff could "go back and look at the surveillance to see what happened." (*Id.*). She further testified that "intake videos" were made for residents of the facility. (*Id*. at 88).

---

[9] Apparently, the chief executive officer of Alsos is Matthew Boyle, who is also Landmark's co-founder and chief executive officer. (*See* ECF 192-10).

*b. Smith*

Smith testified it was Landmark's practice to take on camera systems that were already installed in the buildings when they were acquired. (*Id.* at 187-88). Smith had no knowledge about the video surveillance system at the facility, what cameras existed, how the surveillance was stored, who would have that information, or whether the video surveillance exists or does not exist for the relevant period. (*Id.* at 188, 198-99, 201, 206-07). Nor did Smith have any knowledge of where the videos of the resident "intakes" and telehealth meetings were located or who would have knowledge of their location. (*Id.* at 201). Landmark had no document retention policy as to the video surveillance during the relevant period. (*Id.* at 192). Landmark is still a tenant of the Mishawaka facility. (*Id.* at 188).

## II. APPLICABLE LAW

### A. The Parties' Dispute as to Governing Law

As a threshold matter, the parties dispute whether federal or state law governs the imposition of sanctions in this case. Plaintiffs contend that Indiana law applies (ECF 191 at 18), but Landmark asserts that federal law controls (ECF 195 at 2-4). "The distinction could be important, as Indiana law allows sanctions for negligent losses of evidence, while federal law generally requires at least 'fault,' which has been described as at least gross negligence …." *Castagna v. Newmar Corp.*, No. 3:15-CV-249 JD, 2019 WL 13272487, at *2 (N.D. Ind. Dec. 9, 2019); *but see Ludwig v. Flaherty & Collins, Inc.*, No. 25A-CT-941, 2026 WL 730709, at *5 (Ind. Ct. App. Mar. 16, 2026) ("[Indiana] Supreme Court has recognized that *intentional* first-party spoliation of evidence may be used to establish an inference that the spoliated evidence was unfavorable to the party responsible. But it has never recognized the same for negligent spoliation, and the Court signaled in *Rosen* [*v. Community Healthcare System*, 277 N.E.3d 2

(2026)] that it remains an open question under Indiana law …. [T]hat notion seems to have entered our jurisprudence without analysis." (citations and internal quotation marks omitted)).

Plaintiffs contend that because the case is brought under diversity jurisdiction, "the duty to preserve pre-suit evidence is governed by Indiana state law – not federal law." (ECF 160 at 4 (citing *Arcelormittal Ind. Harbor LLC v Amex Nooter, LLC*, No. 2:15-CV-195-PRC, 2018 WL 509890, at \*2 (N.D. Ind. Jan. 23, 2018); *Allstate Ins. Co. v. Sunbeam*, 53 F.3d 804, 806 (7th Cir. 1995); *Large v. Mobile Tool Int'l, Inc.*, No. 1:02-CV-177, 2008 WL 89897, at \*7 (N.D. Ind. Jan. 7, 2008); *Bonilla v Texon Indus. Corp.*, No. 1:13-cv-01830-SEB-MJD, 2015 WL 10792026, at \*10 (S.D. Ind. Aug. 19, 2015)); *see also* ECF 191 at 18).[10] Landmark counters that "Plaintiffs' factual allegations focus overwhelmingly on events that occurred well after this litigation began: discovery requests, Rule 26 conferences, alleged failures to search electronic systems during discovery, and purported delays or deficiencies in production." (ECF 195 at 3).

In *Castagna v Newmar Corp.*, the Court delved into the "lurking issue … about the source of law governing the motions [for spoliation sanctions]." 2019 WL 13272487, at \*2. It noted that "[e]very circuit court to have considered the question has concluded that federal law governs the imposition of sanctions for spoliation in federal courts, even in cases arising under diversity jurisdiction." *Castagna*, 2019 WL 13272487, at \*2 (footnote omitted) (citing *Sherman v. Rinchem Co.*, 687 F.3d 996, 1006 (8th Cir. 2012)). It further noted that "[t]he Seventh Circuit has not confronted that question, though, and several district courts in this circuit have reached the opposite conclusion." *Id.* The *Castagna* Court opined: "[T]he consensus among the circuits

---

[10] Plaintiffs rely on *ArcelorMittal Indiana Harbor LLC v. Amex Nooter, LLC*, 2018 WL 509890, a diversity jurisdiction case, in arguing that Indiana law governs their motion for sanctions. (ECF 191 at 18-20). But *Arcelormittal Indiana Harbor LLC* involved a discrete pre-suit spoliation of physical evidence located at the scene of a fire. Here, in contrast, whether the purported spoliation occurred pre-suit (sometime between July 9, to August 17, 2023) or after the suit was filed on August 18, 2023, is far from clear. Consequently, the Court does not view *ArcelorMittal Indiana Harbor LLC* to be as persuasive on the governing law dispute as Plaintiffs contend.

that federal rules govern is better reasoned. The duty to preserve evidence can arise from many different sources, including state law." *Id.* at *3 (citing *Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804, 806 (7th Cir. 1995); *Banks v. Enova Fin.*, No. 10 C 4060, 2012 WL 12539830 (N.D. Ill. July 10, 2012)). "But the power to issue sanctions for violations of that duty is derived from rules of civil procedure and courts' inherent powers, which are procedural in nature." *Id.* (citations and footnote omitted). Reasoning that "federal courts apply their own procedural rules even where state law supplies the substantive rule of decision," the *Castagna* Court analyzed the motions for sanctions under federal law. *Id.* (citation omitted).

In *Aspen American Insurance Co v. Interstate Warehousing, Inc.*, however, the Court opined that Indiana law, not federal law, applied to the motion for spoliation sanctions in a diversity case. 372 F. Supp. 3d 709, 726-27 (N.D. Ind. 2019); *see also Napier v. Louis Dreyfus Co. LDAI Holdings, LLC*, No. 3:17-cv-535-PPS-MGG, 2018 WL 5016336, at *4 (N.D. Ind. Oct. 15, 2018) (collecting cases). There, the Court noted that its outcome on the spoliation issue would be the same whether analyzed under Seventh Circuit or Indiana law. *Aspen Am. Ins. Co..* 372 F. Supp. 3d at 27.

Here, too, for the reasons to be explained herein, the Court's outcome on Plaintiffs' motion for sanctions is the same whether the Court applies federal or Indiana law. Accordingly, for purposes of thoroughness, the Court will set forth both the federal and Indiana applicable legal standards and cite both federal and Indiana cases in the analysis section.

### B. Federal Legal Standard

"A party has a duty to preserve evidence over which it has control and reasonably knows or could foresee would be material to a potential legal action." *Bryant v. Gardner*, 587 F. Supp. 2d 951, 967-68 (N.D. Ill. Nov. 21, 2008) (citations omitted); *see also ChampionsWorld, LLC v.*

*U.S. Soccer Fed'n*, 276 F.R.D. 577, 582 (N.D. Ill. Aug. 17, 2011)). Stated another way, "[p]arties have a duty to preserve evidence once they know or should know that litigation is imminent." *Castagna*, 2019 WL 13272487, at *3 (citing *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008); *N. Ind. Pub. Serv. Co. v. Aqua Env't Container Corp.*, 102 N.E.3d 290, 301 (Ind. Ct. App. 2018)).

"Both the Federal Rules of Civil Procedure and courts' inherent authority allow courts to impose sanctions for violations of that duty. To impose the extreme sanction of dismissal [or default judgment], a court must find that evidence was lost or destroyed due to a party's 'willfulness, bath faith, or … fault.'" *Id.* (citing *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2006); *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642 (7th Cir. 2011)). "Fault, in contrast to willfulness or bad faith, does not require a showing of intent, but presumes that the sanctioned party was guilty of 'extraordinarily poor judgment' or 'gross negligence' rather than mere 'mistake or carelessness.'" *Id.* (quoting *Ramirez*, 845 F.3d at 776).

"In finding that sanctions for spoilation are appropriate, a Court must be satisfied:

(1) that there was a duty to preserve the specific documents and/or evidence, (2) that the duty was breached, (3) the culpability for the breach rises to a level of willfulness, bad faith or fault, (4) the party seeking the evidence suffered prejudice as a result of the breach, and (5) an appropriate sanction can ameliorate the breach.

*Cahill v. Sheriff of Cook Cnty. Thomas Dart*, No. 13 C 361, 2016 WL 7093434, at *4 (N.D. Ill. Mar. 4, 2016) (R. & R.)*, adopted as modified sub nom.*, *Cahill v. Dart*, No. 13-CV-361, 2016 WL 7034139 (N.D. Ill. Dec. 2, 2016); *see also Odong v. City of Indianapolis*, No. 1:14-cv-00710-TWP-MJD, 2015 WL 4428036, at *2 (S.D. Ind. July 17, 2015).

"Sanctions [for spoilation of evidence] include awarding reasonable expenses, attorney fees, barring evidence or arguments, permitting adverse inferences, and dismissing claims or

entering default judgment." *Bryant*, 587 F. Supp. 2d at 968 (citations omitted); *see Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 428 (7th Cir. 2010) ("In order to draw an inference that the missing documents contained information adverse to the defendants, [the plaintiff] must demonstrate that the defendants intentionally destroyed the documents in bad faith." (citations omitted)). "An award of sanctions must be proportionate to the circumstances surrounding the failure to comply with discovery." *Castagna*, 2019 WL 13272487, at *4 (quoting *Langley v. Union Elec. Co.*, 107 F.3d 510, 515 (7th Cir. 1997)).

### C. Indiana Legal Standard

"Spoliation is a particular discovery abuse that involves the intentional or negligent destruction, mutilation, alteration, or concealment of physical evidence." *Aqua Env't Container Corp.*, 102 N.E.3d at 301 (applying Indiana law) (citing *Popovich v. Ind. Dep't of State Revenue*, 17 N.E.3d 405, 410 (Ind. Tax Ct. 2014)). "A duty to preserve evidence arises when a first-party claimant knew, or at the very least, should have known, that litigation was possible, if not probable." *Ludwig*, 2026 WL 730709, at *8 (citation and internal quotation marks omitted).

"A party raising a claim of spoliation must prove that (1) there was a duty to preserve the evidence, and (2) the alleged spoliator either negligently or intentionally destroyed, mutilated, altered, or concealed the evidence." *Id.* (citing *Popovich*, 17 N.E.3d at 410); *see also Glotzbach v. Froman*, 854 N.E.2d 337, 338-39 (Ind. Ct. 2006). "[A] finding of spoliation alone does not necessarily require the imposition of sanctions." *Aqua Env't Container Corp.*, 102 N.E.3d at 302 (citing *Popovich*, 17 N.E.3d at 410); *see also Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 189-90 (Ind. 2011)).

"When deciding whether to sanction a party for the spoliation of evidence, courts consider two primary factors: (1) the degree of culpability of the party who lost or destroyed the

evidence; and (2) the degree of actual prejudice to the other party." *Aqua Env't Container Corp.*, 102 N.E.3d at 303 (citing *Popovich*, 17 N.E.3d at 410); *see Castagna*, 2019 WL 13272487, at *3 ("Indiana courts weigh the spoliating party's culpability and the degree of prejudice to the opposing parties in deciding whether to impose sanctions." (citations omitted)). "Remedies available to address a party's spoliation of evidence include dismissal of a claim, entry of default judgment against the culpable party, exclusion of testimony or other evidence regarding the destroyed evidence, or giving a spoliation or adverse instruction to the jury." *Green v. Ford Motor Co.*, No. 1:08-cv-0163-LJM-TAB, 2008 WL 5070489, at *4 (S.D. Ind. Nov. 25, 2008) (citing *Gribben v. Wal-Mart Stores*, 824 N.E.2d 349, 351 (Ind. 2005)).[11] "[The Court] must always ensure that a sanction is 'just' in light of the particular circumstances of each case." *Popovich*, 17 N.E.3d at 410 (citations omitted)).

### III. ANALYSIS

At the outset, the evidence actually at issue in Plaintiffs' motion for sanctions must be clarified. In their motion and initial briefing, Plaintiffs described the purportedly missing evidence as "video surveillance footage" and "Microsoft Teams/Sunwave EMR communications" or "Teams/Sunwave communications". (*See* ECF 159 at 1; *see also* ECF 160, 166). However, through the evidentiary hearing and post-hearing briefing, it became apparent that the electronic communications at issue are, more accurately, Microsoft Teams communications, as the evidence revealed that Sunwave is a separate EMR documentation program. (*See* ECF 187, 191, 196; *see also* ECF 191 at 13 ("Teams communications were

---

[11] "[Prior to January 1, 2026] … Indiana Trial 37 did not permit the imposition of sanctions when ESI was lost as a result of the routine, good faith operating of an electronic information system." *Ludwig*, 2026 WL 730709, at *7 (citing Ind. Tr. R. 37(E)). "But effective January 1, 2026, that rule … now makes an adverse instruction available without proof of intent so long as the non-spoliating party has been prejudiced by the loss of ESI …." *Id.* (citing Ind. Tri. R. 37(E)).

separate from Sunwave; the only way to access those communications is through Teams."); *id.* at 25 ("[I]t was Landmark's practice to collect Teams data and Sunwave to put into the legal Sharepoint file that is given to legal counsel."); ECF 196 at 5 ("These [gaps in Harris's care] would have been filled through video evidence and the Teams communications.").

There was also testimony referencing two types of video evidence at the evidentiary hearing: (1) the video surveillance footage at issue in Plaintiffs' motion for sanctions, and (2) "intake" videos in which care providers met with residents electronically as part of their care. (ECF 187 at 88, 116, 200-01). Because the video surveillance footage is the subject of Plaintiffs' motion for sanctions, not "intake" videos, the Court confines this Order to the video surveillance footage ("video surveillance") and Microsoft Teams communications ("Teams", "Teams communications", "Teams messages", or "Teams messaging").

### A. Landmark Had a Duty to Preserve the Video Surveillance and Teams Communications

There is no real dispute between the parties that Landmark's duty to preserve the video surveillance and Teams communications arose, at the latest, within three days of Harris's death. (*See* ECF 191 at 20; ECF 195). Two residents died at the facility within the six days preceding Harris's death on July 9, 2023. (ECF 192-4). Landmark's own Incident Report dated July 11, 2023, identified a "system breakdown" as contributing to Harris's suicide. (ECF 192-2). By July 11, 2023, the Police had requested the video surveillance for Harris. (ECF 192-4). And most significantly, on July 12, 2023—three days after Harris's death—Landmark's in-house counsel enacted a litigation hold for Harris. (ECF 187 at 186-87, 205, 211-12).

### B. Landmark Breached Its Duty to Preserve the Video Surveillance and Teams Communications

Nor is there any real debate that Landmark knew the video surveillance and Teams communications were relevant and needed to be preserved. Both the Incident Report and the

16

EMR explicitly mentioned a Teams communication with a nurse practitioner. (*See* 187 at 138; ECF 192-2, 192-3). Plaintiffs' witnesses testified that Teams messaging was the primary way for off-site and on-site staff to communicate about all aspects of patient care and the facility. (*See* ECF 187 at 79, 100, 125, 127). Swopes testified that she issued an order via Teams for HLOC for Harris and communicated via Teams with the on-site nurse and the clinical director regarding Harris. (*Id.* at 138, 172-73). Landmark knew the Coroner requested the video surveillance for the other two resident deaths just three days before Harris's death. (ECF 192-8). Within two days of Harris's death, the Police requested the video surveillance for Harris. (ECF 192-4).

The evidence also establishes that video surveillance and Teams communications did exist at some point. To reiterate, Plaintiffs' witnesses testified that Teams messaging was the primary method of daily communication among off-site and on-site staff. (*Id.* at 79, 100, 125, 127). Northern testified that Landmark could review and save video surveillance from previous days. (ECF 187 at 87-88). In fact, Landmark admitted it saved the video surveillance for the period of July 3 to July 5, 2023 (ECF 189 at 40-41), and that it retrieved and preserved the video surveillance requested by the Coroner (*id.* at 87-91). However, Landmark has not produced any video surveillance or Teams communications for Harris in response to Plaintiffs' discovery requests. (*See* ECF 191 at 23).

### *C. Landmark's Degree of Culpability*

Since the parties commenced discovery in this case in October 2023 (ECF 14), Landmark's narrative about the video surveillance and Teams communications has morphed. In their February 2024 discovery responses, Landmark did not identify any video surveillance or electronic communications with specificity on their privilege log but asserted such evidence was "privileged and confidential under 42 CFR Part 2." (ECF 161-3 at 2; *see* ECF 161-16). In their

response brief dated November 18, 2025, Landmark suggested "technological and institutional limitations rather than willful misconduct" precluded them from disclosing the video surveillance and Teams communications. (ECF 165 at 8).

Then, at the December 9, 2025, hearing, Landmark's counsel acknowledged that Teams messages exist, just not for Swopes. (ECF 189 at 58, 65-66). Counsel represented that Teams messages from Swopes "never existed" and that it was "very clear that she's kind of potentially misremembering how she communicated." (ECF 189 at 58, 65-66). Counsel further stated that Landmark was "not on notice for the William Harris matter", that "the video is going to have a specific retention policy", and any video surveillance "was certainly destroyed … in the normal course of business long before [August 5, 2023]." (*Id.* at 38, 41; *see id.* at 39 ("It's [overwritten], either one week or two weeks depending on the certain facility.")).

However, at the February 2026 evidentiary hearing, Smith testified that Landmark actually had no retention policy for video surveillance or Teams communications during June and July 2023. (ECF 187 at 192, 194, 196, 198); *see DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 964 (N.D. Ill. Jan. 19, 2021) ("The absence of a reasonable understanding of the client's information systems is strong evidence that counsel did not conduct a reasonable inquiry." (citations omitted)).

In the face of its own inconsistent representations, Landmark now simply argues there is no evidence it acted with intent to deprive Plaintiffs of the video surveillance or Teams communications. (ECF 195). That is a valid point, as Plaintiffs "failed to adduce evidence that [Landmark] intentionally or in bad faith destroyed [the video surveillance and Teams communications]." *Richardson v. City of Chi.*, No. 08 C 4824, 2012 WL 3643908, at *5 (N.D. Ill. Aug. 22, 2012). But that is not the end of the analysis. "[S]anctions may be appropriate … where

the noncomplying party acted *either* with wilfulness, bad faith *or* fault." *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992) (citations omitted); *see also Rosen*, 277 N.E.3d at 8 n.2 ("[The Indiana Supreme] Court has not had occasion to decide whether mere negligence is enough to justify the sanction of an adverse inference instruction, or whether instead something more is required.").

The Court has no difficulty concluding on this record that Landmark's conduct evinces "fault, but not willful destruction of documents or bad faith." *Larson v. Bank One Corp.*, No. 00 C 2100, 2005 WL 4652509, at *13 (N.D. Ill. Aug. 18, 2005). "'[F]ault' … doesn't speak to the noncomplying party's disposition …, but rather only describes the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation." *Id.* (citation omitted) (concluding the defendant's conduct evidenced "fault, but not willful destruction or bad faith," where defendant's destruction or loss of several categories of documents reflected "extraordinarily poor judgment" and the failure to implement a document retention policy constituted "gross negligence"); *see Marrocco*, 966 F.2d at 224 (finding defendant's conduct fell within the classification of "fault" where it reflected "extraordinarily poor judgment" in the way it handled certain evidence, stood idly for months before attempting to investigate the loss of the evidence, and waited even longer before informing the plaintiffs that the evidence was missing). Here, Landmark demonstrated "extraordinarily poor judgment" by failing to create and implement a retention policy for video surveillance and Teams communications during the relevant period and "gross negligence" by failing to preserve the video surveillance and Teams communications for Harris in accordance with Landmark's duty that arose, at the latest, on July 12, 2023. *Marrocco*, 966 F.2d at 224.

**D. Degree of Prejudice to Plaintiffs**

"To suffer substantive prejudice due to spoliation of evidence, the lost evidence must prevent the aggrieved party the use of an essential or 'crucial' piece of evidence to their underlying claim." *Larson*, 2005 WL 4652509, at *13 (citing *Langley by Langley v. Union Elec. Co.*, 107 F.3d 510 515 (7th Cir. 1997)); *see also Aqua Env't Container Corp.*, 102 N.E.3d at 303. "[I]n cases where the noncompliance is the result of fault rather than a more culpable mental state, courts often have used prejudice as a balancing tool or fulcrum upon which the scales may tip in favor of default or against it." *Danis v. USN Commc'ns, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *34 (N.D. Ill. Oct. 20, 2000) (collecting cases); *see also Aqua Env't Container Corp.*, 102 N.E.3d at 303. "[I]n cases where fault, rather than a culpable state of mind, gives rise to the destruction of evidence and the prejudice suffered is because some—perhaps even the 'best,' but not necessarily the only—evidence has been destroyed, then the choice of the severest sanction is not necessarily justified." *Danis*, 2000 WL 1694325, at *34 (citations omitted); *see also WESCO Distrib., Inc. v. ArcelorMittal Ind. Harbor, LLC*, 23 N.E.3d 682, 703, 706 (Ind. Ct. App. 2014) (stating that the trial court's response to the loss of evidence depends on both the degree of culpability and the extent of the prejudice).

Plaintiffs contend they are "extremely prejudiced" without the video surveillance and Teams communications because this evidence "acts as the most accurate historian in a case where the injured party is unable to testify on his behalf." (ECF 191 at 28). Plaintiffs argue this evidence would have shown Swopes's attempts to elevate Harris to a HLOC, the opposition she faced from on-site staff, her communications with the clinical director, and "provided critical insight" whether Harris's death could have been prevented. (*Id.*). They further argue the video surveillance would have shown whether the thirty, then fifteen, minute checks took place and

whether Harris "attempted to meet with nursing staff and was disregarded …." (*Id.*). Plaintiffs assert that "[w]ithout this evidence, [they are] prevented from proving many of [their] claims against Defendants." (*Id.*).

Plaintiffs, however, have not identified any particular claim or element they cannot prove without the video surveillance and Teams communications. And as Landmark emphasizes, Plaintiffs possess alternative evidence, "including medical records, witness testimony, policies and procedures, deposition testimony, and expert analysis." (ECF 195 at 5). While there is no doubt Plaintiffs are prejudiced to some degree by Landmark's failure to preserve the video surveillance and Teams communications, the Court is not persuaded that Plaintiffs cannot prove their claims without this evidence.

### E. Sanctions

"A court is given broad discretion to choose the appropriate sanction for a discovery violation given the unique factual circumstances of every case." *Danis*, 2000 WL 1694325, at *31 (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976)); *see also Aqua Env't Container Corp.*, 102 N.E.3d at 300-01. "[A]ny sanctions rendered [must] be proportionate to the offending conduct …." *Id*. (citing *United States v. Golden Elevator, Inc.*, 27 F.3d 301, 303 (7th Cir. 1994); *Crown Life Ins. v. Craig*, 995 F.2d 1376, 1382 (7th Cir. 1993)); *see also Miller v. Fed. Express Corp.*, 6 N.E.3d 1006, 1011 (Ind. Ct. App. 2014) (recognizing that Indiana courts have considerable discretion to impose sanctions "as are just" in response to discovery violations). Having considered the evidence of record and the parties' arguments, the Court finds the following sanctions are a measured and proportionate response to Landmark's breach of its duty to preserve the video surveillance and Teams communications for Harris.

To begin, the Court in its discretion concludes that Plaintiffs' requested sanctions of a

default or an adverse jury instruction (ECF 191 at 29) are not proportionate here, given there is no evidence that Landmark destroyed the evidence with intent or in bad faith. *See DR Distribs., LLC*, 513 F. Supp. 3d at 958 ("Intent must be established before a court can impose sanctions, such as adverse jury instructions, default, and dismissal under Rule 37(e)(2)." (citation omitted)); *Richardson*, 2012 WL 3643908, at *5-6 (denying the plaintiff's spoliation jury instruction due to the lack of evidence of any intentional act or bad faith); *see also WESCO Distrib., Inc.*, 23 N.E.3d at 706 (declining to impose an adverse inference instruction where "the instruction tendered by WESCO was not supported by evidence that ArcelorMittal had actively suppressed evidence it knew or suspected had a bearing on the case"). Nor is Plaintiffs' request for a jury instruction that Landmark "knew Mr. Harris was suicidal, failed to implement 15-and 30-minute checks, and failed to timely escalate him to a [HLOC] as ordered by … Swopes" (ECF 195 at 8) in any way appropriate, as it reaches far beyond an inference about missing evidence under Rule 37(e) and speaks to the merits of the case.

Instead, the Court will impose a curative measure of instructing the jury that it can consider Landmark's duty to preserve the video surveillance and Teams communications for Harris, the circumstances surrounding the loss of this evidence, and that the evidence was relevant to Plaintiffs' claims. *See DR. Distribs., LLC*, 513 F. Supp. 3d at 958  ("A common curative measure courts impose is instructing the jury that it can consider the circumstances surrounding the loss of the ESI." (citation omitted)). This remedy attempts to alleviate the prejudice Plaintiffs incurred by Landmark's failure to preserve the video surveillance and Teams communications. *See* Fed. R. Civ. P. 37(e)(1) ("[T]he court … upon finding prejudice to another party from loss of information, may order measures no greater than necessary to cure the prejudice …."); *see also Ludwig*, 2026 WL 73709, at *10-11 (declining to impose adverse

instruction but allowing the plaintiff to introduce evidence at trial that the defendant failed to produce surveillance footage from the date of the incident).

An award of attorneys' fees and costs incurred in litigating the motion is also appropriate in Plaintiffs' favor. "[A] court's power to impose curative measures under Rule 37(e)(1) includes the power to award attorney's fees and costs that were incurred in connection with bringing the motion." *Pable v. Chi. Transit Auth.*, No. 19 CV 7868, 2023 WL 5955832, at *6 (N.D. Ill. Aug. 16, 2023) (citation omitted); *see Sonrai Sys., LLC v. Romano*, No. 16 C 3371, 2021 WL 1418405, at *16 (N.D. Ill. Jan. 20, 2021) (awarding the plaintiff attorney fees where the award would help address the prejudice caused by the defendant's spoliation and "serve to deter future spoliation" (collecting cases)); *see also Gribben*, 824 N.E.2d at 351. "Under the Rule, a party prejudiced by the spoliation of ESI may recover its 'reasonable' attorney's fees and costs." *Pable*, 2023 WL 5955832, at *6 (citations omitted). Therefore, Plaintiffs will be afforded thirty days to file a petition in support of their reasonable attorney fees and costs incurred in litigating the motion for sanctions.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for sanctions (ECF 159) is GRANTED to the extent the Court imposes the following sanctions:

(1)    The Court will instruct the jury that it can consider Landmark's duty to preserve the video surveillance and Teams communications for Harris, the circumstances surrounding the loss of this evidence, and that the evidence was relevant to Plaintiffs' claims; and

(2)    Landmark shall pay Plaintiffs' reasonable attorney fees and costs incurred in litigating the motion for sanctions. Plaintiffs are AFFORDED thirty days to file a petition in

support of their fees and costs. Landmark is afforded fourteen days thereafter to file a response, if any, to the amount of fees sought.

SO ORDERED.

Entered this 6th day of July 2026.

/s/ Andrew L. Teel
Andrew L. Teel
United States Magistrate Judge